UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                   Plaintiff,

        v.

VICTOR DePONCEAU,

              Defendant.
_____

<u>REPORT & RECOMMENDATION</u>

05-CR-6124L

        By Order dated September 6, 2005, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 6).

        Defendant Victor DePonceau ("DePonceau") is charged in a single-count indictment.  The indictment charges that on August 24, 2005, DePonceau unlawfully possessed ammunition after having been convicted of a crime punishable by a term of imprisonment exceeding one year, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  (Docket # 4).

        Currently pending before this Court for a Report and Recommendation are DePonceau's motions to suppress (1) statements he made during a conversation he had with an inmate at the Monroe County Jail on August 13, 2005; (2) statements he made to law enforcement officers at the time of the subsequent execution of a search warrant for his business

at 2153 Clifford Avenue; and, (3) physical evidence seized during that search.  (Docket # 54).[1] The following constitutes this Court's Report and Recommendation on DePonceau's motions.

## BACKGROUND

In January 2005, an individual named Frank Povoski was arrested and charged with arson arising from the burning of several Town of Webster police vehicles.  (*See* Docket # 54, Ex. A, Passmore Affidavit ("Passmore Aff.") at 2-3).  While Povoski was detained in the Monroe County Jail (the "Jail") pending trial on those charges, the Monroe County Sheriff's Office began to investigate his possible involvement in a conspiracy to murder witnesses who were expected to testify against him in the arson trial.  (Passmore Aff. at 2-9; Docket # 56, Ex. C at 1034-37).  As part of the investigation, an eavesdropping warrant was issued authorizing the interception of communications between Povoski and Ilia Santini (Povoski's girlfriend) "and others as yet unknown" occurring over the two-way intercom system used in the visiting area of the Jail.  (Docket # 56, Ex. C at 1011-21).

In the early stages of the Povoski investigation, DePonceau also was detained in the Jail pending trial on an unrelated matter and was apparently unable to post bail to secure his release.  Based upon various intercepted communications, agents involved in the Povoski investigation came to suspect that DePonceau had agreed to assist in the murder conspiracy in return for Povoski's agreement to help him post bail.  (Passmore Aff. at 4-5).

---

[1]  DePonceau's omnibus motion also sought, *inter alia*, discovery and inspection, disclosure of *Brady* material, notice pursuant to Rule 12(d) of the Federal Rules of Criminal Procedure, rulings on evidentiary matters under Rules 404, 608 and 609 of the Federal Rules of Evidence, preservation of all rough notes, an audibility hearing and disclosure of *Jencks* material.  Each of these requests was either resolved by the parties or decided in open court by the undersigned on February 28, 2007.  (Docket # 60).

On August 13, 2005, Santini visited Povoski at the Jail.  The visit occurred in a "non-contact visitation booth" in which law enforcement had surreptitiously installed a recording device pursuant to the terms of the eavesdropping warrant.  Immediately following the conversation between Povoski and Santini, DePonceau visited separately with Povoski in the same booth.  Their conversation was also recorded and is the subject of DePonceau's suppression motion.  (Passmore Aff. at 5).  DePonceau asserts that the interception of his conversation with Povoski exceeded the scope of the wiretap warrant.  (Docket # 54).

The government contends that the conversation between DePonceau and Povoski was lawfully intercepted pursuant to the language in the eavesdropping warrant authorizing the interception of communications between Povoski and Santini "and others as yet unknown." (Docket # 74).  Alternatively, it argues that DePonceau did not have a reasonable expectation of privacy while talking with Povoski in the visiting area of the Jail.  As to the second contention, the Court held an evidentiary hearing.  (Docket # 74).  The hearing also addressed the circumstances relating to DePonceau's motion to suppress statements made by him eleven days later, during the course of a search of his business at 2153 Clifford Avenue.

## TESTIMONIAL EVIDENCE

At the hearing, the government offered the testimony of Investigator Patrick Crough of the Monroe County Sheriff's Office and former Sheriff's Investigator Thomas Passmore.  Sheriff's Deputy Michael Chambry and Victor DePonceau were called by the defense.  The following is a summary of their relevant testimony.

On August 13, 2005, Investigator Passmore installed a recording device in the two-way intercom system of one of the non-contact booths in the visiting area of the Jail in order to record a visit between Povoski and Santini that was expected to occur that day.  (Tr. 3-4).[2] Santini in fact arrived at the Jail later that morning and met with Povoski in the visitation booth in which the recording device had been installed.  (Tr. 5).  This meeting lasted approximately one hour, and Santini exited the booth at 10:30 a.m.  (Tr. 6).  One minute later, DePonceau entered the booth that Povoski was still occupying and engaged in a conversation with him.  (Tr. 6). Their conversation lasted approximately forty-five minutes.  (Tr. 9).

The visiting area of the Jail is a large "cafeteria-sized open area," approximately fifty to sixty square feet in size, that contains countertop tables arrayed in two horseshoe shapes. (Tr. 18-20, 115).  Attached to one side of the counters are stools on which the prisoners sit. Visitors sit on benches attached to the opposite side of the counters.  (G.Exs. 1-4).  Inmates are admitted into the inside portion of the horseshoes; visitors sit along the outside of the horseshoes. The back wall of the visiting area contains four non-contact booths, each of which is approximately six to eight square feet in size.  (Tr. 9, 19-20, 92, 94).  These booths are completely enclosed on the side in which the prisoner is seated, while the visitor's side is open to the visiting area.  A large pane of glass separates the two sides of the booth, and visitors and prisoners must utilize a two-way intercom system in order to converse.  (Tr. 8-9; G.Exs. 1-4).

According to Deputy Chambry, when visitors and inmates enter the general visiting area, a sheriff's deputy assigns them to one of fifty-five designated spots along the

---

[2]  The transcript of the suppression hearing conducted before this Court on July 19, 2007 (Docket # 73) and August 7, 2007 (Docket # 75), shall hereinafter be referenced as "Tr. __".

horseshoes.  (Tr. 90-91, 100).  The assigning deputy generally will try to "scatter" people around

the room in order to decrease the level of noise.  (Tr. 103-04).  Although the room may

accommodate as many as 110 visitors and fifty-five prisoners, at the time of the visit between

DePonceau and Povoski, only twenty-five other inmates were present in the visiting area meeting

with their visitors.  (Tr. 100; D.Ex. D).  According to Deputy Chambry, it was "probable" that no

other inmates and visitors were placed in the areas closest to the non-contact booths.[3]  (Tr. 100).

DePonceau testified that on August 13, 2005, he visited Povoski at the Jail.  (Tr.

120).  DePonceau arrived for his scheduled visit at approximately 9:45 a.m. and was admitted

into the visiting area where he waited for his visit.  (D.Ex. D).  Forty-five minutes later, at

approximately 10:30 a.m., DePonceau met with Povoski in one of the non-contact booths.  Their

meeting lasted approximately twenty minutes, during which time DePonceau observed no other

individuals in the immediate surrounding area.  No signage was posted, nor was he otherwise

advised, that his conversation might be monitored.  To the contrary, DePonceau testified that he

believed that his conversation with Povoski was "totally private."  (Tr. 98, 122-25).

Eleven days later, on August 24, 2005, a search warrant was executed for

DePonceau's business at 2153 Clifford Avenue.  (Tr. 42).  When the search team arrived, they

encountered DePonceau and pat-frisked him.  (Tr. 64).  Investigator Crough assisted with the

warrant and arrived at the location at approximately 8:07 a.m., where he observed DePonceau in

the parking lot.  (Tr. 43).  Crough approached DePonceau, identified himself as a Monroe County

Sheriff's investigator and provided him with a copy of the search warrant.  Crough advised

---

[3]  Records of inmate seating assignments for that day apparently no longer exist.  (Tr. 95).

DePonceau that the officers were executing a search warrant in connection with a murder conspiracy investigation.  (Tr. 43-44).

Crough asked DePonceau whether he would be willing to accompany him to the Sheriff's Office to answer questions.  (Tr. 44).  DePonceau responded by invoking his right to remain silent and stating that he was not willing to talk until he had the opportunity to consult with his attorney.  (Tr. 44-45, 60).  Crough did not ask any questions related to the investigation, but remained in the parking lot to ensure that DePonceau did not interfere with the search. According to Crough, although DePonceau was not permitted to enter the building as the search was being conducted, he was not handcuffed or physically restrained.  (Tr. 45; D.Ex. B).  During the search, which lasted approximately two hours, DePonceau continuously paced the area, frequently expressing his belief that the search was part of a corrupt plot by certain government officials to prevent or dissuade him from exposing their involvement in an illicit conspiracy.  (Tr. 46-49, 57-58).

After the search had progressed for slightly more than an hour, DePonceau asked Crough whether anything had been seized.  Crough relayed DePonceau's inquiry to the searching deputies and then informed DePonceau that the agents had seized some correspondence and a small box of ammunition.  (Tr. 49).  DePonceau remarked that the material did not connect him to a murder conspiracy and that he had forgotten he had the ammunition, which was for handguns that he no longer owned.  (Tr. 50).  Crough did not respond to DePonceau's statement. (Tr. 50).  When the search was completed, Crough walked DePonceau through the premises and provided him with a receipt for all items seized.  (Tr. 50-51).  Crough and the other deputies then left the scene.

According to Crough, DePonceau did not appear to be under the influence of alcohol or drugs, nor did he complain of any injuries. DePonceau did not appear to have any difficulty understanding or communicating with the deputies. Crough also testified that no threats or promises were made to DePonceau during the execution of the search. (Tr. 51-53).

DePonceau also testified about the execution of the search warrant on August 24, 2005. He stated that at approximately 9:00 a.m., four or five police cars arrived at his business. (Tr. 129). Initially, a uniformed Sheriff's deputy approached him and ordered him to put his hands up, which he did. The deputy then conducted a pat-frisk and removed from his person pens, a pager and the keys to his business. (Tr. 130, 132). Other deputies used those keys to enter the premises and begin the search. (Tr. 132). DePonceau testified that he did not believe he was free to leave the area. (Tr. 131).

Shortly thereafter, Investigator Crough arrived and approached DePonceau. (Tr. 131). Crough immediately advised DePonceau that he was not permitted to enter his store. DePonceau testified that he asked Crough whether he was under arrest, but Crough ignored the question and also refused to provide him with a copy of the search warrant. (Tr. 132). Instead, Crough told DePonceau that he was being "detained" outside his store while the search was being conducted. (Tr. 134). According to DePonceau, he attempted to approach the store, but Crough prevented him from doing so and blocked his view of the search. (Tr. 135).

At the beginning of their interaction, Crough engaged in "small talk" with DePonceau, questioning him about his family and his education. (Tr. 136). The subject of the conversation then turned to DePonceau's involvement with Povoski and Santini. DePonceau immediately indicated that he had an attorney and that he felt he was under arrest and would

prefer to speak with his attorney.  (Tr. 136).  Instead of ending the conversation, DePonceau

testified that Crough began to "badger" him in an effort to get him to talk.  For example, Crough

entreated him to talk by advising him that the police viewed him as a witness, not a suspect.  (Tr.

136-38).  When DePonceau refused to speak, Crough threatened that if he did not help, the

district attorney would play "hardball" with him.  (Tr. 138).

      While this conversation was occurring, DePonceau heard loud noises from inside

his store and repeatedly asked what the officers were looking for and whether he was under

arrest.  (Tr. 139-40).  Crough initially evaded his questions, but eventually informed him that

some documents and ammunition had been seized.  (Tr. 141).  Crough then asked DePonceau

whether he owned guns, and DePonceau replied that he had a New York State pistol permit, but

that it had been revoked.  (Tr. 142).  DePonceau testified that he never told Crough that he had

forgotten he had the ammunition or that it belonged to a gun he no longer owned.  (Tr. 142).

## DISCUSSION

      DePonceau moves to suppress the statements he made to Povoski while in the

non-contact visitation booth at the Jail and those he made to Investigator Crough while the search

was being executed.  DePonceau also moves to suppress the tangible evidence seized from his

business during the search.  (Docket # 54).

## I.  Statements Made in Visitation Booth

      As noted above, the government contends that the conversation between

DePonceau and Povoski was lawfully intercepted pursuant to an eavesdropping warrant issued in

the Povoski murder conspiracy investigation.  The issue before this Court is the lawful scope of

that warrant.

Pursuant to 18 U.S.C. § 2518(3), before issuing a wiretap order, a judge must

determine:

> [1] that there is probable cause to believe that a crime has been, is
> being, or is about to be committed; [2] probable cause to believe
> that communications about the crime will be obtained through the
> wiretap; [3] that alternative means have been tried and failed or
> appear too dangerous or unlikely to succeed; and [4] probable
> cause that the premises to be wiretapped are being used for
> criminal purposes or are used or owned by the target of the wiretap.

*United States v. Wagner*, 989 F.2d 69, 71 (2d Cir. 1993).  The probable cause standard applicable

to wiretaps is the same as that required for a traditional search warrant, *id.* (citing *United States v.

Rowell*, 903 F.2d 899, 901-902 (2d Cir. 1990); *United States v. Fury*, 554 F.2d 522, 530 (2d Cir.

1977)); that is, when considering the totality of the circumstances, whether a fair probability

exists that contraband or evidence of a crime will be found in the place to be searched.  *See

Illinois v. Gates*, 462 U.S. 213, 238 (1983).

A.  **Scope of the Eavesdropping Warrant:**  DePonceau does not challenge the

validity of the eavesdropping warrant or the investigators' authority to intercept communications

between Povoski and Santini.  Rather, he asserts that investigative agents exceeded the bounds of

the warrant by recording his conversations with Povoski.

The eavesdropping warrant was issued by Monroe County Court Judge John J.

Connell on May 10, 2005, and was extended on three occasions, the last by Monroe County

Court Judge Frank P. Geraci on August 5, 2005.  (*See* Docket # 56, Exs. C, D).  The warrant was

based upon the Monroe County District Attorney's application, accompanied by an affidavit of

9

Monroe County Sheriff's Investigator David Vaughn that contained a detailed description of the

ongoing murder conspiracy investigation involving Povoski and Santini.  (*See* Docket # 56, Ex.

D).  Relevant to this dispute, the eavesdropping orders permitted law enforcement officers to

monitor and record certain conversations that occurred in the visiting area of the Jail by wiring a

device into the earpiece of the two-way intercom system.  (Docket # 56, Ex. C at 1016, Ex. D at

1496-97).

Specifically, the warrant provided:

IT IS ORDERED that Michael C. Green, District Attorney of the
County of Monroe, State of New York, and his duly authorized
agents from the Monroe County Sheriff's Office, the Webster
Police Department and the Monroe County District Attorney's
Office are authorized and empowered to eavesdrop on, listen to,
overhear, record and make copies of any and all oral
communications of Frank J. Povoski dob 1/2/61 and Ilia "Nikki" I.
Santini dob 7/25/70 and others as yet unknown, which are
transmitted or received over a electronic recording device, which
relate to the above mentioned crimes, including but not limited to
conversations involving: (1) offers to hire, and/or pay a source to
commit murder in violation of Article 125 of the New York State
Penal Law; (2) acceptances of such offers; (3) plans for the murder;
to include transportation, location, and means of said murder; (4)
instructions to and from co-conspirators; and (5) information
regarding the identity of co-conspirators that are involved in said
murder conspiracy; (6) any plans for the escape; to include
transportation, location and means of said escape.  This recording
device will be utilized to capture conversations between Frank J.
Povoski dob 1/2/61 and Ilia 'Nikki' I. Santini dob 7/25/70 and
others as yet unknown, while in the visiting area of the Monroe
County Jail, Rochester, New York, County of Monroe, and State of
New York.

(Docket # 56, Ex. C at 1013-14, Ex. D at 1494-95).[4]

---

[4] In the August 5, 2005 warrant, this paragraph authorizes additional law enforcement agencies to
participate in the monitoring and recording, namely, the Rochester Police Department and the New York State

(continued...)

ORDERED that the eavesdropping is authorized for a thirty day (30) period, for every time during the thirty day time frame that Frank J. Povoski is visited by his girlfriend Ilia 'Nikki' I. Santini. Said period is to begin upon the first installation of interception devices and shall commence in no event later than ten (10) days from the issuance of this warrant.

(Docket # 56, Ex. C at 1021, Ex. D at 1502-1503).

According to DePonceau, the eavesdropping warrant allowed the interception only of communications between Povoski and Santini and not those between Povoski and him. (Docket # 54).  The government counters that the challenged interception was within the scope of the warrant's authorization permitting the interception of communications involving Povoski and Santini "and others as yet unknown, while in the visiting area of the Monroe County Jail."  The defendant's contrary interpretation, the government asserts, renders the "others as yet unknown" language meaningless.  (Docket # 56).

I reject the government's contention and find that the warrant's authorization was limited to intercepting jail visit communications between Povoski and Santini and others who may have accompanied Santini during those meetings.  To read the warrant otherwise would have given law enforcement agents the unfettered discretion to record any communications between Povoski and any individual who came to visit him at the Jail.

Such a broad interpretation is refuted by the language of the warrant itself, which limits the period of authorization to "a thirty (30) day period, for every time during the thirty day time frame that Frank J. Povoski is visited by his girlfriend Ilia 'Nikki' I. Santini."  (Docket # 56, Ex. C at 1021, Ex. D at 1502-1503).  According to this provision, the authority to intercept

---

[4](...continued)
Police.  (Docket # 56, Ex. D at 1494).

communications was triggered only by a visit between Povoski and Santini.  Consistent with that authorization, the warrant also provided that it was based upon the issuing judge's satisfaction that probable cause existed to believe that evidence of the conspiracy would be obtained "by use of an Eavesdropping Warrant for a specific area of the visiting area of the . . . Jail . . . , which will be utilized by Frank J. Povoski when he is visited by his girlfriend Ilia 'Nikki' I. Santini." (Docket # 56, Ex. C at 1011-12, Ex. D at 1491-92).

In addition, the application for the warrant submitted by the District Attorney sought "permission to monitor oral communications each time there is a prisoner visitation between Frank Povoski and his girlfriend Ilia 'Nikki' I. Santini."  (Docket # 56, Ex. C at 1028, Ex. D at 1526).  This request was consistent with Investigator Vaughn's supporting affidavit describing the suspected conspiracy between Povoski and Santini and the investigative need, as he perceived it, for law enforcement to intercept communications between those two individuals. Like the District Attorney's application, Vaughn's affidavit requested permission to intercept prisoner communications between Povoski and Santini.  Specifically, it requested that the warrant "allow eavesdropping for any visitation between [Povoski and Santini] while they visit at the Monroe County Jail visitation area," noting that "[c]onversations regarding the conspiracy are likely to occur at such times that the aforementioned parties meet so they can further discuss the details of their conspiracy."  (Docket # 56, Ex. C at 1043-44, Ex. D at 1516-17).

Considering the information presented in the application, as well as the specific requests contained therein, I find it unlikely that the issuing judge would have authorized the interception of communications between Povoski and every visitor who may have come to see him in the Jail.  The more reasonable interpretation – and the one that is supported by the

12

language of the wiretap warrant, as well as its application – is that "the others as yet unknown" language was intended to encompass any individuals who accompanied Santini during her visits with Povoski.

Accordingly, because Santini was not present during the visit between DePonceau and Povoski, I find that the interception of their conversation was not authorized by the warrant.

**B.  DePonceau Had a Reasonable Expectation of Privacy:**  Having concluded that the conversation between Povoski and DePonceau exceeded the scope of the warrant, this Court must now consider the government's alternative argument that the interception should not be suppressed because DePonceau did not have a reasonable expectation of privacy at the time of his conversation with Povoski.

The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searched and seizures."  U.S. Const. amend. IV.  The statutory provisions of Title III (18 U.S.C. §§ 2510-2521) themselves prohibit the intentional interception of conversations without a court order, *see Katz v. United States*, 389 U.S. 347, 351 (1967).  While Title III extends to prison communications, *United States v. Amen*, 831 F.2d 373, 378 (2d Cir. 1987) ("Title III clearly applies to prison monitoring"), *cert. denied*, 485 U.S. 1021 (1988), it is equally clear that inmates and non-inmate visitors to prisons have diminished expectations of privacy in the prison setting. *See*, *e.g.*, *United States v. Willoughby*, 860 F.2d 15, 21 (2d Cir. 1988) ("[c]ontacts between inmates and noninmates may justify otherwise impermissible intrusions into the noninmates' privacy"), *cert. denied*, 488 U.S. 1033 (1989).  *See also Lanza v. New York*, 370 U.S. 139, 143 (1962) ("[I]t is obvious that a jail shares none of the attributes of privacy of a home, an

automobile, an office or a hotel room.  In prison, official surveillance has traditionally been the

order of the day.").  In order to challenge the interception of communications, a defendant must

demonstrate that he had a subjective expectation of privacy that society recognizes, or is prepared

to recognize, as reasonable.  *Smith v. Maryland*, 442 U.S. 735, 740-41 (1979); *Katz v. United*

*States*, 389 U.S. at 351 (Harlan, J. concurring).

       The government contends that DePonceau had no reasonable expectation of

privacy during his conversation with Povoski because he was in a large visiting area of the Jail,

did not have control over his location within that area and could not be assured that he would not

be overheard.  The assertions by the government relating to the size and capacity of the visiting

room and the Sheriff's Office's control of prisoner visits, while not irrelevant, largely miss the

mark.  Regardless of the circumstances that could have existed in the visiting room on any other

day, on the day in question, the room was occupied well below its capacity of 165, with only

twenty-five visits occurring at the time of DePonceau's visit.  (Tr. 98-100).  Moreover,

DePonceau was assigned to one of the non-contact booths, which are located on the outside

perimeter of the visitation room.  Each of the non-contact booths has three walls enclosing the

prisoner area and a glass partition separating the prisoner and his visitor, necessitating their

communication through an intercom system with a telephone-like handset.  No signage was

posted by the intercom system to warn that communications could be monitored or intercepted.

(Tr. 98).  *Cf. United States v. Amen*, 831 F.2d at 378-80 (neither Title III nor Fourth Amendment

violated by monitoring of telephone calls between inmates and nonmates where inmates are

advised that calls are monitored and their use of institutional telephones will constitute consent to

such monitoring).  No testimony was elicited by the government contradicting DePonceau's

assertion that no one was seated near him, passed behind him or entered Povoski's enclosed area during their visit.  (Tr. 122-23, 125).  Even Deputy Chambry testified that based upon the Sheriff's Office practice of "scatter[ing]" inmates, it was "probable" that no other prisoners or inmates were seated in the immediate vicinity of DePonceau.  (Tr. 100, 103-104).

Thus, on the record before me, and in the absence of controlling or persuasive authority that visitors to a prison relinquish all expectations of privacy upon entering a prison to visit an inmate, I find that DePonceau had a reasonable expectation of privacy that his conversation with Povoski would be private.[5]  *Cf. United States v. Willoughby*, 860 F.2d at 22 (circumstances of communication between inmates did not give rise to reasonable expectation of privacy where it occurred in public area of prison within ten feet of four or five other individuals).  Accordingly, I recommend granting DePonceau's motion to suppress statements made by him during his intercepted conversation with Povoski at the Jail.

## II.   Statements Made During Execution of Search Warrant

Invoking both the Fifth and Sixth Amendments, DePonceau also moves to suppress all the statements he made when he was standing outside 2153 Clifford Avenue during the execution of the warrant for his business.  (Docket # 54).  The government opposes DePonceau's motion on the grounds that he was not in custody at the time the challenged statements were made and that his Sixth Amendment right to counsel had not yet attached. (Docket ## 56, 74).

---

[5]  Whether DePonceau – a non-incarcerated visitor to the prison – had a reasonable expectation of privacy in his conversation with Povoski is of course a different question from whether Povoski – an inmate – had such an expectation.

    **A. DePonceau was Not Subjected to Custodial Interrogation:**  In this case, the government has conceded that the defendant was not advised of his *Miranda* warnings before he made the statements in question.  Such warnings were unnecessary, the government maintains, because DePonceau was not subjected to custodial interrogation during his interaction with Investigator Crough.  I agree.

    As the Second Circuit Court has articulated,

> [c]ustodial interrogation exists when a law enforcement official questions an individual and that questioning was (1) conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak (the in custody requirement) and (2) when the inquiry is conducted by officers who are aware of the potentially incriminating nature of the disclosures sought (the investigative intent requirement).

*United States v. Rodriguez*, 356 F.3d 254, 258 (2d Cir. 2004) (citing *United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987) (internal citations omitted)).  In determining whether a defendant was in custody, a court must undertake a two-part analysis.  First, the court must ask "whether a reasonable person would have thought he was free to leave the police encounter at issue."  *United States v. Newton*, 369 F.3d 659, 672 (2d Cir.), *cert. denied*, 543 U.S. 947 (2004).  If the answer is affirmative, the inquiry concludes.  *Id.*  If, however, the reasonable person would not have felt free to leave, the Court then must proceed to the second step of the analysis and determine whether, in addition to feeling not free to leave, the "reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest."  *Id.* (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).  "Only if the answer to this second question is yes was the person 'in custody for practical purposes' and 'entitled to the full panoply

of protections prescribed by *Miranda*.'" *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440

(1984)); *see United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992) ("[d]ecisions in this circuit

have emphasized that in the absence of actual arrest, an interrogation is not 'custodial' unless the

authorities affirmatively convey the message that the defendant is not free to leave").

        In the instant matter, Investigator Crough and DePonceau have offered materially

divergent testimony about their interaction outside 2153 Clifford Avenue. Having considered

that testimony, as well as the witnesses' demeanors, I credit the testimony offered by Crough,

finding him to be the more credible witness concerning the events of the warrant execution.

Accepting his testimony, I find as follows.

        Crough arrived at 2153 Clifford Avenue at approximately 8:07 a.m. and observed

DePonceau standing in the parking lot. (Tr. 42-43). Although DePonceau was not permitted to

enter the premises, he was not handcuffed or otherwise physically restrained. (Tr. 45). Crough

approached DePonceau, identified himself and explained that the police were there to execute a

search warrant for his business relating to a murder conspiracy investigation. (Tr. 43-44).

Crough provided a copy of the warrant to DePonceau and asked him whether he would be willing

to go to the station house to answer questions. DePonceau refused and stated that he was not

willing to talk until he had the opportunity to consult with his attorney. (Tr. 44, 60). DePonceau

did not appear to Crough to be intoxicated or under the influence of drugs or alcohol. (Tr.

51-53).

        Crough remained in the parking lot with DePonceau for approximately two hours.

During that time, DePonceau continuously paced the area and frequently expressed his opinion

that he was the target of a conspiracy involving corrupt law enforcement, court and judicial

officers.  (Tr. 46-49, 57-58).  At approximately 9:15 a.m., DePonceau asked Crough if anything

had been seized during the search.  In response, Crough spoke with one of the searching deputies

and then reported to DePonceau that correspondence and a small box of ammunition had been

seized.  (Tr. 49).  After hearing about the ammunition, DePonceau stated that he had forgotten

that he had it and that it was for some handguns he no longer owned.  (Tr. 50).  At the conclusion

of the search, Crough walked through the premises with DePonceau and provided him with a

receipt for the items seized.  Crough and the searching deputies then left, leaving DePonceau at

the scene.  (Tr. 50-51).

On this record, I find that DePonceau was neither in custody, nor interrogated, and

thus not entitled to *Miranda* warnings.  No questions likely to elicit incriminating responses were

posed to DePonceau.  Rather, he was asked if he would agree to answer questions, a request that

he declined.  The only restriction placed upon DePonceau was a prohibition from entering the

premises while it was bring searched.  Such a minor restriction simply does not amount to

custodial detention.  *See United States v. Kirsh*, 54 F.3d 1062, 1068 (2d Cir.) (defendant who

was prevented from entering apartment during search was not in custody), *cert. denied*, 516 U.S.

927 (1995).  I therefore recommend that DePonceau's motion to suppress statements on Fifth

Amendment grounds be denied.

**B.  DePonceau's Sixth Amendment Rights Had Not Attached:**  DePonceau's

motion based upon the Sixth Amendment is likewise unavailing.  The Sixth Amendment right to

counsel does not attach until "at or after the initiation of adversary judicial proceedings against

the defendant."  *United States v. Gouveia*, 467 U.S. 180, 187 (1984).  According to the Supreme

Court, an adversary judicial proceeding – "whether by way of formal charge, preliminary hearing,

indictment, information, or arraignment" – does not commence until "the government has committed itself to prosecute, [at which time] the adverse positions of the government and defendant [have] solidified." *Kirby v. Illinois*, 406 U.S. 682, 689 (1972).  Simply stated, the Sixth Amendment right to counsel does not attach until after the initiation of formal charges.  *See United States v. Duvall*, 537 F.2d 15, 20-22 (2d Cir.) (Sixth Amendment right to counsel does not attach at arrest on a criminal complaint), *cert. denied*, 426 U.S. 950 (1976); *United States v. Ripley*, 2003 WL 21982964, *2 (S.D.N.Y. 2003) (denying defendant's motion to suppress pre-indictment statements because Sixth Amendment right to counsel had not yet attached); *United States v. Rahman*, 1994 WL 388918, *6 (S.D.N.Y. 1994) (right to counsel did not attach until indictment was filed), *cert. denied*, 528 U.S. 1094 (2000); *United States v. Kornblau*, 586 F. Supp. 614, 622 (S.D.N.Y. 1984) (pre-indictment arrest is not critical stage of prosecution triggering Sixth Amendment right to counsel).

Here, the statements that DePonceau challenges were made during the search on August 24, 2005.  The Criminal Complaint against DePonceau was not filed until seven days later on August 31, 2005.  Thus, at that time he made his statements to Crough, DePonceau had neither been indicted nor arraigned on any charging instrument.  Accordingly, DePonceau's Sixth Amendment right to counsel had not yet attached.

Thus, I recommend that DePonceau's Sixth Amendment challenge to the admissibility of statements made during the execution of the search warrant be denied.

## III.  Tangible Evidence Seized During Search

In his final motion, DePonceau moves to suppress the evidence seized pursuant to the execution of the search warrant for 2153 Clifford Avenue.  (Docket # 54).  DePonceau argues

that the search warrant for his business was defective because it was based upon the illegally intercepted conversation he had with Povoski in the Jail visiting room.

Under the Supreme Court's holding in *Wong Sun v. United States*, 371 U.S. 471, 484 (1963), all evidence that is either directly or indirectly derived from unconstitutional police conduct is tainted and is subject to suppression as "fruit of the poisonous tree." The question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 488 (internal quotation omitted). The taint of illegally obtained evidence may be purged in one of two ways: either by showing that the evidence was also available through some independent source; or, by demonstrating that the causal link between the illegal conduct and the evidence is attenuated. *See id.* at 487. It is the government's burden to prove dissipation. *See Brown v. Illinois*, 422 U.S. 590, 604 (1975).

This case calls into question application of the independent source doctrine. "When the challenged evidence has an independent source," such evidence is not subject to the exclusionary rule because "exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation." *Murray v. United States*, 487 U.S. 533, 537 (1988) (quoting *Nix v. Williams*, 467 U.S. 431, 443 (1984)). Under this doctrine, "[w]hen an application for a search warrant includes both tainted and untainted evidence, the warrant may be upheld if the untainted evidence, standing alone, establishes probable cause." *Laaman v. United States*, 973 F.2d 107, 115 (2d Cir. 1992) (collecting cases), *cert. denied*, 507 U.S. 954 (1993); *see United States v. Marchand*, 564 F.2d 983, 993 (2d Cir. 1977) ("[w]hen an

20

affidavit in support of a search warrant contains information which is in part unlawfully obtained, the validity of a warrant and search depends on whether the untainted information, considered by itself, establishes probable cause for the warrant to issue") (citing *Wong Sun v. United States*, 371 U.S. 471), *cert. denied*, 434 U.S. 1015 (1978); *James v. United States*, 418 F.2d 1150, 1151-52 (D.C. Cir. 1969) (validity of warrant depends on whether untainted information, standing alone, was sufficient to establish probable cause).

   Here, in addition to the one illegally intercepted conversation between Povoski and DePonceau, the search warrant application described numerous communications between Povoski and Santini that were lawfully intercepted pursuant to the eavesdropping warrants discussed *supra*.  The affidavit also summarized numerous telephone conversations between DePonceau and Santini that were intercepted pursuant to a warrant issued for Santini's cellular telephone.  Taken together, the lawfully intercepted conversations reveal evidence that:  at Povoski's direction, Santini posted bail to secure DePonceau's release; DePonceau agreed to "handle" Povoski's problem; DePonceau was attempting to locate witnesses expected to testify against Povoski; Povoski told Santini that he would dismiss "any previous notes" if DePonceau would "take[] care of things"; DePonceau indicated he was willing to "break the law" to help Povoski; DePonceau and Santini discussed the date of the expected testimony of one of the witnesses; DePonceau told Santini that he would find "the other guy and take his tongue out"; DePonceau and Santini agreed that he would be paid $1,000 up front and the rest after he "perform[ed]"; and, Santini told Povoski that she had given DePonceau a letter from Povoski in which "everything is spelled out."  (Docket # 56, Ex. B at 4-9).

The affidavit also described two meetings between DePonceau and Santini at 2153 Clifford Avenue, which DePonceau advised Santini was a building he had recently purchased.  (Docket # 56, Ex. B at 8).  In addition, the last communication summarized in the affidavit is a telephone call between DePonceau and Santini in which DePonceau recounted his meeting with Povoski at the Jail (the August 13, 2005 meeting that was illegally intercepted).  According to the affidavit, DePonceau remarked to Santini in that conversation that he "is a suit and tie kind of person and has no point in doing the remodeling job with an electrical saw or maybe a nail gun, but if that has to happen that way then they will nail up the drywall with a nail gun."  (Docket # 56, Ex. B at 9).

Based upon my review of Passmore's affidavit, I easily find that ample probable cause existed for the warrant even in the absence of the illegally-intercepted conversation between DePonceau and Povoski in the Jail.  For this reason, I conclude that the evidence seized pursuant to the warrant may be admitted under the independent source doctrine.  *See*, *e.g.*, *Laaman v. United States*, 973 F.2d at 115; *United States v. Marchand*, 564 F.2d at 993.  Thus, I recommend that DePonceau's motion to suppress evidence seized during the search of 2153 Clifford Avenue be denied.

## CONCLUSION

For the foregoing reasons, it is my recommendation that DePonceau's motion to suppress statements made during his conversation with Povoski at the Monroe County Jail **(Docket # 54)** be **GRANTED**.  It is also my recommendation that DePonceau's motion to

suppress statements made and evidence seized during the search of 2153 Clifford Avenue

**(Docket # 54)** be **DENIED**.

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated:  Rochester, New York
        January   24   , 2008

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

      **ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

      **ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[6]

      The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance.  *See*, *e.g.*, *Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

      <u>**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**</u>  *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

      The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  <u>**Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.**</u>

      Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**


                                  *s/Marian W. Payson*
                                      MARIAN W. PAYSON
                              United States Magistrate Judge

Dated: Rochester, New York
        January   24  , 2008

---

    [6] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(F) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).